IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

TODD ALBERT ISON,

    Plaintiff,

v.                                       Civil Action 2:16-cv-1155
                                       Magistrate Judge Jolson

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

## OPINION AND ORDER

Plaintiff, Todd Albert Ison, filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying his application for Title II disability insurance benefits and Title XVI supplemental security income. For the reasons that follow, Plaintiff's Statement of Errors (Doc. 18) is **OVERRULED**, and judgment is entered in favor of Defendant.

### I. BACKGROUND

#### A. Prior Proceedings

Plaintiff Todd Albert Ison filed for disability insurance benefits ("DIB") on September 26, 2013 and supplemental security income ("SSI") on January 24, 2014, alleging a disability onset date of June 7, 2008. (*See* Doc. 12, Tr. 14, Tr. 70–71, PAGEID #: 79, 136–137). Earning records show that Plaintiff acquired sufficient quarters of coverage to remain insured through December 31, 2008. (*Id.*, Tr.70, PAGEID #: 136). Plaintiff's applications were denied initially on November 19, 2013 (*id.*, Tr. 77, PAGEID #: 143) and upon reconsideration on January 30, 2014 (*id.*, Tr. 78, PAGEID #: 144). Administrative Law Judge Jason C. Earnhart (the "ALJ") held a hearing on July 27, 2015 (Doc. 12, Tr. 29, PAGEID #: 94), after which he denied benefits

in a written decision on September 21, 2015 (*id.*, Tr. 11, PAGEID #: 76). That decision became final when the Appeals Council denied review on October 6, 2016. (*Id.*, Tr. 1, PAGEID #: 66).

Plaintiff filed this case on December 8, 2016 (Doc. 1). On February 10, 2017, however, Plaintiff's attorney filed a Statement Noting Todd Albert Ison's Death and informing the Court that he planned to substitute a successor-representative as soon as practicable. (Doc. 11) The Commissioner filed the administrative record on February 13, 2017 (Doc. 12), and Plaintiff filed a Statement of Specific Errors on April 7, 2017 (Doc. 18), along with an unopposed motion to substitute Robert Ison, father of Plaintiff-Decedent Todd Albert Ison, with respect to his claim for DIB (Doc. 17). The Court granted the Motion on April 11, 2017. (Doc. 19). The Commissioner responded to the Statement of Errors on May 22, 2017 (Doc. 23), and a Reply was filed on June 6, 2017 (Doc. 24).

Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, and upon consent of the parties, this case was referred to the undersigned to conduct all proceedings and order the entry of final judgment. (Doc 22).

### B. Relevant Testimony at the Administrative Hearing

At the hearing, Plaintiff's counsel explained that Plaintiff[1] suffered a workplace back injury that prevented him from engaging in substantial gainful activity. (Doc. 12, Tr. 32, PAGEID #: 97). Plaintiff later elaborated that he was splitting wood at work when he "felt like a bee sting in the back." (*Id.*, Tr. 41, PAGEID #: 106). Following his injury, Plaintiff underwent surgery and stated "[i]t seemed to work until the disc popped again. It was like a week after." (*Id.*, Tr. 45, PAGEID #: 110). Plaintiff described the second pop as feeling "like somebody stabbed me again in the back and twisting and fire on – going down my legs." (*Id.*). Upon

---
[1] Unless otherwise noted, "Plaintiff" refers to Plaintiff-Decedent Todd Albert Ison.

prompting by his attorney, Plaintiff rated his pain in the morning at "about a nine and three-quarters" out of ten. (*Id.*, Tr. 55, PAGEID #: 120).

Plaintiff testified that he didn't believe he could work because he couldn't sit "for as long as [he] used to;" he couldn't stand for very long; he couldn't lift more than a gallon of milk at a time; and his left leg had weakness with a tendency to give out. (*Id.*, Tr. 49, PAGEID #: 114). In terms of daily activities, Plaintiff stated that he was able to prepare simple meals and cut his grass for ninety minutes at a time using his riding lawn mower, although he explained that it took him three to four days to cut less than a half-acre because of the amount of trees. (*Id.*, Tr. 50–51, PAGEID #: 115–16). Plaintiff also stated that he was able to do laundry and sweep, and his only hobby was watching TV. (*Id.*, Tr. 52–53, 60, PAGEID #: 117–18, 125). Finally, Plaintiff testified that he could walk 400 feet, stand for ten to fifteen minutes, and sit for thirty to forty-five minutes. (*Id.*, Tr. 55, 57, PAGEID #: 120, 122). The ALJ sought to clarify this testimony, considering Plaintiff's previous testimony was that he could sit and ride his lawn mower for ninety minutes, and Plaintiff replied by stating that he rode his mower "on and off" for those ninety minutes. (*Id.*, Tr. 57–58, PAGEID #: 122–23).

At the beginning and end of the hearing, the ALJ noted that there was significant evidence that the State Agency did not see in their review that had since been added to the record. (*Id.*, Tr. 33, 67, PAGEID #: 98, 132). Accordingly, the ALJ stated he was going to send the record out to a medical expert for an additional interrogatory with a specific focus on the date last insured. (*Id.*, Tr. 34, 67, PAGEID #: 99, 132).

### C. Relevant Medical Background

*1. Prior to the Date Last Insured*

On December 28, 2007, while lifting a large piece of wood into a wood splitter at work, Plaintiff experienced the immediate onset of low back and left leg pain. (*See e.g.*, Doc. 12, Tr. 309, PAGEID #: 379). It was determined that Plaintiff required surgical intervention for a herniated disc, and he met with Dr. Timothy Manuel for a preoperative physical on July 2, 2008. (*Id.*, Tr. 217, PAGEID #: 287). At that time, Dr. Manuel noted that Plaintiff "continue[d] to be in fairly moderate pain, 4 to 5 on a scale of 10 in the low back area . . . with radiation into the left leg." (*Id.*). One week later, Plaintiff underwent a L5-S1 left microlaminectomy, medial factectomy, and foraminotomy excision to repair his herniated disc. (*Id.*, Tr. 273, PAGEID #: 343).

Approximately four weeks after surgery, on August 11, 2008, Dr. Mavian saw Plaintiff for a follow-up. (*Id.*, Tr. 224, PAGEID #: 294). At the appointment, Plaintiff reported that "overall he [was] 30% better." (*Id.*). Dr. Mavian opined that Plaintiff's incision was well healed, he ambulated without difficulty, and an x-ray of the lumbar spine taken at the office was normal. (*Id.*). Dr. Mavian recommended that Plaintiff take two Aleve in both the morning and evening and prescribed physical therapy to work on range of motion strengthening and modalities. (*Id.*, Tr. 225, PAGEID #: 295).

Dr. Mavian saw Plaintiff for another follow-up on October 27, 2008, and reported that a left S1 transoarminal nerve block injection by Dr. Emily Yu about two weeks prior "did minimal to change any of his symptoms" and his "left leg radicular symptoms and backache [were] still consistent at approximately 5 out of 10." (*Id.*, Tr. 219, PAGEID #: 289). On physical exam,

straight leg raising on the left was positive for left leg radicular symptoms as well as backache, and straight leg raising on the right was negative. (*Id.*). Dr. Mavian once again noted that Plaintiff ambulated without any difficulty or assistive devices. (*Id.*). Nevertheless, Dr. Mavian ordered a new MRI of the lumbar spine. (*Id.*).

Plaintiff saw Dr. Mavian again on December 19, 2008. At this appointment it was noted that Plaintiff sat comfortably, ambulated without difficulty, and his incision was well-healed. (*Id.*, Tr. 221, PAGEID #: 291). Dr. Mavian reviewed an MRI performed at Fayette County Hospital, which showed mild to moderate compression at L5-S1. (*Id.*, Tr. 222, PAGEID #: 292). Dr. Mavian presented the option to re-operate on Plaintiff (and he agreed) "to re-explore the L5-S1 nerve root and decompress and remove any scar tissue that may be aggravating the patient's symptoms." (*Id.*).

### 2. *After the Date Last Insured*

On May 26 2009, Plaintiff saw Dr. Manuel for a preoperative evaluation for his second back surgery because he "continue[d] to have fairly significant low back pain." (Doc. 12, Tr. 214, PAGEID #: 284). At the evaluation, Dr. Manuel noted that Plaintiff was ambulatory with no lateralizing deficits and cleared him for surgery. (*Id.*, Tr. 215, PAGEID #: 285).

Plaintiff underwent the second back surgery by Dr. Mavian, a lumbar re-exploration microlaminectomy, medial facetectomy, foramiotomy, and excision of epidural ventral scar and disk, on June 2, 2009. (*Id.*, Tr. 263, PAGEID #: 333). The postoperative diagnosis was lumbar disk reherniation and scar and soft herniated disk adhesions. (*Id.*).

On March 17, 2010, Plaintiff saw Dr. Manuel for continued pain in his lower back, which he characterized as "a dull ache." (*Id.*, Tr. 322, PAGEID #: 392). Treatment notes indicate that

5

"[t]he pain is precipitated by heavy weight lifting" and "[t]he symptoms are aggravated by exertion, prolonged standing and prolonged sitting." (*Id.*). It was noted at this appointment, as well as appointments over the next several years, that Plaintiff's gait was normal. (*E.g.*, *id.*, Tr. 323, 325, 328, 331, 343, 423, 469, PAGEID #: 393, 395, 398, 401, 413, 493, 539).

Dr. Mavian performed a third back surgery on Plaintiff—a lumbar re-exploration and extensive nerve root decompression—to repair a lumbar disk re-herniation on October 5, 2010. (*Id.*, Tr. 234, PAGEID #: 304). Surgery notes state that a "[f]inal inspection of the intralaminar interval at the L5-S1 level was found to be free of any bony or disk stenosis." (*Id.*, Tr. 238, PAGEID #: 308).

On January 30, 2013, Dr. John Cunningham evaluated Plaintiff during a one-time visit with no treatment provided. (*Id.*, Tr. 309, PAGEID #: 379). At the evaluation, straight leg raising in the sitting position on the right was negative at 90 degrees and on the left caused complaints of low back pain extending from the calf up to the low back at 70 degrees. (*Id.*, Tr. 310, PAGEID #: 380). Dr. Cunningham opined that Plaintiff had reached a treatment plateau at which no fundamental, functional, or physiological change could be expected despite continuing medical or rehabilitative procedures. (*Id.*, Tr. 311, PAGEID #: 381). Dr. Cunningham further stated that Plaintiff could not return to the workplace without restrictions, which included not lifting, carrying, pushing, or pulling objects greater than 30 pounds, as well as avoiding bending at the waist, kneeling, crawling, or squatting. (*Id.*). Ultimately, Dr. Cunningham opined that Plaintiff required only continued conservative management. (*Id.*, Tr. 312, PAGEID #: 382).

On July 24, 2015, Dr. Kenneth Writesel completed a medical statement regarding Plaintiff's lumbar and cervical conditions for his social security disability claim. (*Id.*, Tr. 855,

PAGEID #: 926). Although Plaintiff indicated at his hearing in 2015 that he had been seeing Dr. Writesel for two years (*see id.*, Tr. 46–48, PAGEID #: 111–13), the medical statement is the only opinion from Dr. Writesel in the record, as there were no additional treatment records submitted. In the medical statement, Dr. Writesel stated that Plaintiff could stand for 30 minutes at a time, sit for fifteen minutes, work for two hours a day, could never bend, and could occasionally stoop. (*Id.*). Additionally, Dr. Writesel opined that Plaintiff was not able to maintain concentration necessary for employment, was not capable of maintaining a regular work pace, and would miss in excess of two days per month as a result of his disabilities. (*Id.*, Tr. 856, PAGEID #: 927).

Following the hearing, the ALJ sought a medical interrogatory from Dr. Ronald E. Kendrick regarding Plaintiff's physical impairments. (*Id.*, Tr. 857, PAGEID #: 928). Dr. Kendrick opined on August 7, 2015, that none of Plaintiff's impairments met or equaled any listing, and particularly explained that Listing 1.04 wasn't met because there was no evidence of motor and sensory loss lasting twelve months or ineffective ambulation. (*Id.*, Tr. 858, PAGEID #: 929). Dr. Kendrick's medical source statement found that Plaintiff could frequently lift and carry up to ten pounds, and occasionally lift and carry eleven to fifteen pounds. (*Id.*, Tr. 860, PAGEID #: 931). Further, Dr. Kendrick opined that Plaintiff could sit for one hour without interruption, stand and walk for thirty minutes without interruption, but could sit for six hours total during a work day and stand and/or walk for four total hours. (*Id.*, Tr. 861, PAGEID #: 932). It was also noted by Dr. Kendrick that Plaintiff did not require the use of a cane to ambulate. (*Id.*).

### D. The ALJ's Decision

The ALJ found that Plaintiff had the following severe impairments: degenerative disc

disease with disc herniation and history of laminectomy, neuritis radiculitis, cardiomyopathy/ heart disease, and obesity. (Doc. 12, Tr. 16, PAGEID #: 81). It was emphasized that for purposes of DIB, Plaintiff "must establish disability prior to the expiration of insured status"— December 31, 2008. (*Id.*, Tr. 19, PAGEID #: 84). The ALL also noted that "[e]vidence of new developments in a claimant's impairments after the expiration of insured status is generally not relevant," and may only be examined when it is established that the impairment existed continuously and in the same degree from the date last insured. (*Id.*). Thus, the ALJ made clear that "the focus of [his] decision [would] be on the evidence pertaining to the claimant's medical condition between June 7, 2008 and December 31, 2008." (*Id.*).

With this in mind, the ALJ found that through Plaintiff's date last insured, his impairments did not meet or medically equal the severity of one of the listed impairments. (*Id.*, Tr. 17, PAGEID #: 82). Specifically, the ALJ stated that because Plaintiff did not have major dysfunction of any joint resulting in inability to ambulate effectively or resulting in inability to perform fine and gross movements effectively, he did not meet the requirements of section 1.02. (*Id.*). Further, Plaintiff did not meet or equal the requirements of section 1.04—which deal with disorders of the spine—because the objective record did not document evidence of, *inter alia*, nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine, or motor loss accompanied by sensory or reflex loss. (*Id.*).

As to Plaintiff's RFC, the ALJ stated:

> [T]he claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that he could occasionally balance, stoop, knell, crouch, crawl, and climb ramps or stairs. He could not climb ladders, ropes, or scaffolds, nor could he operate foot controls with the lower left extremity.

8

(*Id.*, Tr. 18, PAGEID #: 83). In making this determination, the ALJ noted that the evidence "appears to show that the claimant was experiencing moderate discomfort, but was able to ambulate with no difficulty, sit comfortably during examination, and used no ambulatory assistive device, at the time of his date last insured." (*Id.*, Tr. 20, PAGEID #: 85).

The ALJ also noted that some references in the medical evidence suggest that Plaintiff's activity level may have been more extensive than what he reported. (*Id.*, Tr. 21, PAGEID #: 86). For example, in May 2012, Plaintiff was treated for an eye injury sustained while working on his motorcycle, which according to the ALJ, demonstrated Plaintiff was able to perform significant bending. (*Id.*). The ALJ also noted that although Plaintiff alleged he was disabled by his back pain and cardiomyopathy, "his symptoms [had] not been sufficiently troubling to cause him to forgo smoking a pack and a half of cigarettes a day, even though abstinence from tobacco would be expected to improve both cardiac and spine health." (*Id.*, Tr. 22, PAGEID #: 87).

In terms of the weight given to medical sources, the ALJ accepted Dr. Cunningham's opinion "insofar as it supports a finding that the claimant's lumbosacral impairment was not work preclusive five years after his disability insurance lapsed." (*Id.*, Tr. 21, PAGEID #: 86). The ALJ afforded Dr. Writesel's opinion no weight, stating that it was unsupported by any medical evidence. (*Id.*). Moreover, Plaintiff testified in 2015 that he had been seeing Dr. Writesel for only two years, meaning that Dr. Writesel opined on Plaintiff's limitations in December 2007, even though he began seeing Plaintiff in 2013. (*Id.*). As a result, the ALJ found that Dr. Writesel had no objective basis for any opinion about the Plaintiff's condition during the six years preceding when he first saw Plaintiff. (*Id.*). Finally, the ALJ noted that Dr. Writesel's opinion contradicted Plaintiff's own hearing testimony, in which he admitted that he

9

could stand for ten to fifteen minutes, sit for up to thirty, and use the riding mower for ninety minutes. (*Id.*).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III. DISCUSSION

In his Statement of Errors, Plaintiff alleges that the ALJ "provided no substantial evidence support for the residual functional capacity determination during the relevant period with the rejection of Dr. Writesel's opinion." (Doc. 18 at 1). Specifically, Plaintiff argues that in formulating the RFC, the only opinion the ALJ discussed that involved the relevant period was the opinion of Dr. Writesel, a treating physician whom the ALJ afforded no weight. (*Id.* at 9–10). Although not entirely clear, Plaintiff appears to be arguing that even assuming that the ALJ properly rejected Dr. Writesel's opinion, "there still is no basis for the devised RFC." (*Id.*).

### A. Treating Physician

Turning first to the ALJ's rejection of Dr. Writesel's opinion, two related rules govern how an ALJ is required to analyze a treating physician's opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted). However, "an ALJ may properly reject a treating physician's opinion that does not meet these standards." *Mixon v. Colvin*, 12 F. Supp. 3d 1052, 1063–64 (S.D. Ohio 2013) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529–31 (6th Cir. 1997).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakley*, 581 F.3d at 406 (alterations in original)); 20 C.F.R. § 404.1527(c)(2). *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550–51 (6th Cir. 2010). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937. The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

Here, the ALJ declined to give controlling weight to Dr. Writesel, stating that his opinion was "unsupported by any medical evidence showing the claimant has been treated by Dr. Writesel." Indeed, the record did not contain any treatment notes besides the medical source statement in 2015 that would support Dr. Writesel's ultimate conclusion. Further, the ALJ explained that in 2015, Plaintiff testified he had been seeing Dr. Writesel for only two years, "which, if true, means that Dr. Writesel had no objective basis for any opinion about the claimant's condition during the preceding six years." (Doc. 12, Tr. 21, PAGEID #: 86). And the Sixth Circuit has made clear that medical source statements prepared after a plaintiff's insured status expired are "generally of little probative value." *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016), *reh'g denied* (Sept. 13, 2016) (citing *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004). Finally, the ALJ noted that portions of Dr. Writesel's opinion contradict Plaintiff's hearing testimony, such as the fact that Dr. Writesel opined Plaintiff could only sit for fifteen minutes at a time, yet his testimony was that he could mow his lawn for ninety minutes at a time. Accordingly, it was not an error for the ALJ to reject Dr. Writesel's opinion, and he sufficiently articulated good reasons for his decision to do so. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391 (6th Cir. 2004) (holding that the ALJ properly rejected a treating physician's conclusion when, *inter alia*, the limitations posed were contrary to the testimony of Plaintiff and unsupported with evidence in the record).

### B. The ALJ's Formulation of the RFC

"A person's RFC is the most that an individual can do despite all physical and mental limitations." *Collins v. Comm'r of Soc. Sec.*, 179 F. Supp. 3d 767, 771 (S.D. Ohio 2016) (citing 20 C.F.R. § 404.1545(a)(1). In his Statement of Errors, Plaintiff suggests that there wasn't

"substantial evidence" to support the ALJ's defined RFC. (Doc. 18 at 9). Specifically, Plaintiff argues that the only opinion providing limitations during the relevant period was that of Dr. Writesel, and if it is assumed that his opinion was properly rejected, there is no basis for the devised RFC. (*Id.*). Thus, according to Plaintiff, the ALJ improperly relied on his own opinion in drawing RFC conclusions from the raw medical data. (*Id.* at 11).

It is important to note that it is the ALJ, not a physician, who ultimately determines a claimant's RFC and resolves conflicts in the medical evidence. 42 U.S.C. § 423(d)(5)(B); *see also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009); 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). In doing so, the ALJ is charged with evaluating several factors in determining the RFC, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)). The ALJ also has discretion to determine whether additional evidence is necessary. *See Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (citing *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001)).

Here, the ALJ's RFC—that Plaintiff had the capacity to perform sedentary work as defined in 20 C.F.R 404.1567(a) and 416.967(a), with a few exceptions—was well-supported by both medical evidence and Plaintiff's testimony. Sedentary work, as defined in the regulations, "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1667(a). Dr. Cunningham's 2013 opinion, which was "adopted" by the ALJ, held that Plaintiff could return to the workplace with

restrictions, including not lifting, carrying, pushing, or pulling objects greater than 30 pounds, as well as avoiding bending at the waist, kneeling, crawling, or squatting. Further, although Plaintiff testified he could carry only a gallon of milk, the ALJ explicitly stated that Plaintiff's activity level appeared to be more extensive than what he reported, and it is within the ALJ's discretion to "consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

Additionally, the ALJ noted that during the relevant time period between June 2008 and December 2008, Plaintiff's pain seemed to be manageable. Indeed, the ALJ explained that at the preoperative evaluation prior to Plaintiff's first back surgery, Plaintiff was experiencing only moderate pain, or a four to five out of ten. Further, following the surgery, Plaintiff reported a 30% improvement in sciatic pain and was directed to only take Aleve. *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) (holding that Plaintiff's "use of only mild medications [] undercuts complaints of disabling pain") (citing *Kimbrough v. Secretary of Health and Human Servs.*, 801 F.2d 794, 797 (6th Cir. 1986)).

Finally, the ALJ emphasized that during the relevant time period, particularly following his first surgery, Plaintiff was observed to ambulate without difficulty. This observation was consistent with treatment notes from October 2008, where Plaintiff was observed sitting comfortably and once again ambulating without difficultly. Although outside the time frame the ALJ focused on, it was also noted that Dr. Manuel's progress notes from March 2010 to March 2014, consistently opined that Plaintiff walked with a normal gait. This further supports that Plaintiff had the exertional capacity to perform sedentary work. *See Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 444 (6th Cir. 2010).

Accordingly, the "record as a whole"—namely, Plaintiff's own statements, Plaintiff's activities of daily living, and the opinions of Dr. Manuel and Dr. Cunningham—contain substantial evidence to support the ALJ's RFC decision. *See Berry v. Astrue*, No. 1:09cv000411, 2010 WL 3730983, at *5 (S.D. Ohio June 18, 2010).

## IV. CONCLUSION

For the reasons stated, Plaintiff's Statement of Errors (Doc. 18) is **OVERRULED** and judgment shall be entered in favor of Defendant.

IT IS SO ORDERED.


Date: September 7, 2017                                        /s/ Kimberly A. Jolson
                                                               KIMBERLY A. JOLSON
                                                               UNITED STATES MAGISTRATE JUDGE